

**FILED**
July 07, 2023 08:26 AM
SX-2018-MC-00066
**TAMARA CHARLES**
**CLERK OF THE COURT**

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

KENRICK MAYNARD,

                    Petitioner,

    v.

GOVERNMENT OF THE VIRGIN
ISLANDS, GOVERNOR ALBERT BRYAN
in his official capacity, ARIEL M. SMITH,
ATTORNEY GENERAL in her official
capacity,[1] BUREAU OF CORRECTIONS
DIRECTOR WYNNIE TESTAMARK in her
official capacity, CITRUS COUNTY
DETENTION CENTER WARDEN MIKE
QUINN in his official capacity,

                    Respondents.

**SX-2018-MC-00066**

PETITION FOR WRIT OF
HABEAS CORPUS

**2023 VI Super 36**

## MEMORANDUM OPINION

¶ I    THIS MATTER is before the Court on the Writ of Habeas Corpus issued October 29, 2020, and Respondents' Return, filed December 11, 2020. By the Writ, the Court found that Petitioner had stated a prima facie case for relief in his Petition for Writ of Habeas Corpus, filed August 7, 2018, and that his claims alleging *Brady* violations and ineffective assistance of trial counsel were not barred as a matter of law. By Order entered February 11, 2021, Petitioner's opportunity to file a traverse was extended for 21 days. To date, Petitioner has not filed a traverse. On August 9, 2022, a hearing was held and additional evidence in the form of sworn testimony and affidavits were presented to the Court. At the hearing, Petitioner was given 21 days following completion of the hearing transcript to file a supplemental brief, Respondents were given 21 days to respond, and Petitioner was given 7 days to reply. The hearing transcript was completed on February 15, 2023. By Order entered February 15, 2023, both parties were given 21 days to file supplemental briefing.

---

[1] Pursuant to V.I. R. Civ. P. 25(d), when a public officer named as a party acting in an official capacity ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party. Such is the case here and the caption is amended accordingly.

Both briefs were filed on June 21, 2023. Because the Court finds that Petitioner was deprived of his constitutionally protected right to effective assistance of counsel at trial, relief will be granted.

## STANDARD OF REVIEW

¶ 2 "Any person who believes he or she is unlawfully imprisoned or detained in custody, confined under unlawful conditions, or otherwise unlawfully restrained of his or her liberty, may file a petition for a writ of habeas corpus to seek review of the legality of that imprisonment or detention." V.I. H.C.R. 2(a). Petitioners may use a writ of habeas corpus to seek redress of constitutional violations. *Rivera-Moreno v. Gov't of the V.I.*, 61 V.I. 279, 297 (V.I. 2014). The presumption of innocence does not apply to habeas proceedings, and the burden is on the petitioner to prove their case. *Fahie v. Gov't of the V.I.*, 73 V.I. 443, 452 (V.I. 2020). "The court must issue a writ of habeas corpus if the petitioner has alleged, prima facie, grounds showing entitlement to relief and the claims are not legally barred." V.I. H.C.R. 2(d)(1).

¶ 3 The Virgin Islands Supreme Court has held that direct appeals of trial court convictions conducted by the Appellate Division of the District Court and the Third Circuit that consider and decide the same claim or claims subsequently raised in a habeas petition "will typically not result in a procedural bar [of that claim in the habeas proceeding] if the claim involves a question of law." *Rodriguez v. Bureau of Corr.*, 70 V.I. 924, 938 n.9 (V.I. 2019); *see also Rivera-Moreno*, 61 V.I. at 303 (holding that a habeas petition can raise issues that were, or could have been, raised on direct appeal to the Appellate Division or the Third Circuit, provided that the issues involve a question of law rather than fact). However, "when a prisoner files a writ of habeas corpus in the Virgin Islands alleging claims already reviewed by another competent court, including a federal court, the local court may, in its discretion, consider that ruling as a basis to deny improper successive review." *Rodriguez*, 70 V.I. at 938-39.

¶ 4 Important to the claims for relief currently pending before this Court, *Brady* violations are questions of law. *Mosby v. Mullgrav*, 65 V.I. 261, 268 (V.I. 2016). Further, ineffective assistance of counsel claims "will rarely be procedurally barred in a habeas proceeding, since…'a claim of ineffective assistance of counsel is not appropriately reviewed for the first time on direct appeal.'" *Blyden v. Gov't of the V.I.*, 64 V.I. 367, 381 (V.I. 2016) (quoting *Codrington v. People*, 57 V.I. 176, 191 (V.I. 2012)). Accordingly, none of Petitioner's claims herein is procedurally barred.

¶ 5    "A petitioner may be awarded a discharge — or another form of redress, such as a new sentencing hearing, that remedies the violation alleged — if any of the seven conditions set forth in 5 V.I.C. § 1314 are met,[2] or if relief is warranted to remedy a constitutional or statutory violation, even if the right to that remedy is not expressly set forth in a statute." V.I. H.C.R. 2(b)(2).

## BACKGROUND[3]

### I.    The Underlying Case

¶ 6    On July 4, 1999, Petitioner Kenrick Maynard and his brother, Ricky Kanasha, were involved in a violent altercation with Leslie Hyman and his cousin, Kimba George, at festival activities during Carnival on St. John. Three weeks later, on July 26, 1999, Leslie Hyman was shot several times in the area of Savan on St. Thomas. On the night of the shooting, Leslie informed police that he did not know who had shot him. However, at Maynard's trial two years later,[4] Leslie testified that Maynard was responsible for the shooting.

¶ 7    Two days later, on July 28, 1999, Leslie's brother, Adolph Hyman, Jr., was walking in Savan with his father, Adolph Hyman, Sr., and Hyman, Sr.'s longtime girlfriend, Maria Weeks.[5] Hyman, Jr. and Weeks both testified at trial that Maynard approached them and began shooting at

---

[2] 5 V.I.C. § 1314 provides:

If it appears on the return of the writ that the prisoner is in custody by virtue of process from any court or judge or officer thereof, such prisoner may be discharged in any of the following cases, subject to the restriction of section 1313 of this title:

(1)  When the jurisdiction of such court or officer has been exceeded.

(2)  When the imprisonment was at first lawful, yet by some act, omission, or event which has taken place afterwards, the party has become entitled to a discharge.

(3)  When the process is defective in some matter of substance required by law rendering such process void.

(4)  When the process, though proper in form, has been issued in a case not allowed by law.

(5)  When the person having custody of the prisoner is not the person allowed by law to detain him.

(6)  Where the process is not authorized by any order, judgment, or decree of any court, nor by any provision of law.

(7)  Where a party has been committed on a criminal charge without reasonable or probable cause.

[3] Unless cited otherwise, background information is distilled from the opinions of the Appellate Division of the District Court of the Virgin Islands in *Maynard v. Gov't of the Virgin Islands*, 51 V.I. 744 (D.V.I. App. 2009) and the United States Court of Appeals for the Third Circuit in *Maynard v. Gov't of the Virgin Islands*, 392 Fed. Appx. 105 (3d Cir. 2010).

[4] Maynard was tried for the shooting of Leslie Hyman and the subsequent murder of Adolph Hyman, Sr. in a single proceeding. (Terr. Ct. Crim. No. ST-F400/2000).

[5] Weeks is also sometimes described as Hyman, Sr.'s common law wife.

Hyman, Sr., and that Hyman, Jr. and Weeks ran away. Weeks testified that she attempted to hide behind a wall, from where she saw Maynard shoot Hyman, Sr. several times while Hyman, Sr. was face down on the ground. Hyman, Sr. died from his injuries. A warrant for Maynard's arrest was issued August 5, 1999, but he was not immediately arrested.

¶ 8     Five months later, in the early morning hours of January 1, 2000, the Virgin Islands Police Department ("VIPD") arrested six individuals in connection with gunshots fired near Hospital Ground on St. Thomas. In searching the surrounding area, officers discovered spent cartridges and two firearms – an MP-45 and an AK-47. The case against those individuals charged with possession of the AK-47 was eventually dismissed for lack of evidence. The firearms found at Hospital Ground, as well as the casings recovered from the scene of Hyman, Sr.'s shooting were submitted to the Federal Bureau of Investigation for forensic testing. That testing disclosed that at least some of the bullets that killed Hyman, Sr. five months earlier had been discharged from the AK-47[6] discovered at Hospital Ground.

¶ 9     Pursuant to the August 5, 1999 warrant, on October 3, 2000, a VIPD forensic investigator traveled to Atlanta, Georgia, where Maynard was incarcerated under the name Samuel E. Blyden,[7] and escorted Maynard back to the Virgin Islands. In May 2001, the Government of the Virgin Islands charged Maynard with five offenses arising out of the above events in Criminal No. ST-F400/2000. The first three counts charged offenses related to the July 26, 1999 shooting of Leslie Hyman,[8] and Counts Four and Five charged offenses related to the July 28, 1999 shooting death of Adolph Hyman, Sr.[9]

¶ 10    Trial began on September 24, 2001, lasting a day and a half. Maynard was acquitted by the jury of Counts One, Two, and Three, and convicted of Counts Four and Five. Maynard's

---

[6] *See* 392 Fed. Appx. at 108 n.5: "A firearms examiner for the Federal Bureau of Investigation testified that one of the firearms was technically a Mac-90, which is a civilian version of the better-known AK-47. However, the parties described the gun as an AK-47 at trial and in briefing....We adopt the parties' convention of referring to the weapon as an AK-47, even though that description appears to be technically incorrect." Similarly, throughout this Opinion, references are to an AK-47.

[7] It is unclear from the record the circumstances under which VIPD learned that Maynard was incarcerated in Georgia under an assumed name.

[8] Count One of the Information charged first-degree assault, Count Two charged third-degree assault, and Count Three charged unauthorized possession of a firearm.

[9] Count Four charged first-degree murder and Count Five charged unauthorized possession of a firearm.

subsequent motion for new trial was denied, and he was sentenced on November 13, 2001 to life imprisonment on the first-degree murder charge, and three years on the unauthorized possession of a firearm charge, to be served concurrently. Judgment and Commitment, Criminal No. ST-F400/2000 (Nov. 21, 2001).

## II.  *Prior Appellate and Habeas Review*

¶ 11  On November 21, 2001, Maynard appealed his Territorial Court conviction to the Appellate Division of the District Court of the Virgin Islands,[10] raising four issues for review.[11] On April 17, 2009, the Appellate Division issued its opinion affirming Maynard's conviction on both counts. Maynard appealed that decision to the Third Circuit Court of Appeals, contending that the Government had violated *Brady v. Maryland* by failing to disclose (1) the identities of the six individuals arrested on January 1, 2000 for possession of the AK-47, and (2) Maria Weeks' drug treatment history. On August 25, 2010, the Third Circuit affirmed Maynard's conviction on both counts.

¶ 12  In 2015, Petitioner Maynard filed a *pro se* "Motion for Extraordinary Writ of Habeas Corpus" in the Superior Court of the Virgin Islands, Division of St. Thomas and St. John, Case No. ST-2015-MC-00070. Maynard argued that he was not attempting to re-litigate the issues presented to the Appellate Division and the Third Circuit, but rather sought "to acquire clarification of distinct [sic] decision of said mentioned courts." The Superior Court treated Maynard's Motion as a Petition for Writ of Habeas Corpus, which it denied, holding that Petitioner sought to "relitigate issues already argued before the Appellate Division and Third Circuit, and...improperly assert[ed] a *Brady* violation." Order, 5 (May 2, 2016).

---

[10] In 2004, the Virgin Islands Legislature established the Supreme Court of the Virgin Islands as the highest court in the Virgin Islands, which assumed its appellate jurisdiction on January 29, 2007, prior to which an initial appeal of right from the Territorial Court could be brought in the Appellate Division of the District Court, followed by a second appeal of right to the Third Circuit Court of Appeals. Effective January 1, 2005, the name of the Territorial Court changed to the Superior Court of the Virgin Islands. *See* Act No. 6687, § 1(b), amending 4 V.I.C. § 2(a) (Oct. 29, 2004).

[11] "Whether the trial court erred by not dismissing the charges as a result of alleged Brady violations; (2) whether the trial court erred by allowing the Government's expert witness to testify about matters that were not disclosed to the defense before trial; (3) whether the trial court erred by not severing the several offenses with which Maynard was charged; and (4) whether alleged prosecutorial misconduct during closing arguments warrants a reversal of Maynard's conviction." *Maynard*, 51 V.I. at 754.

### III.    The Instant Petition

¶ 13    On August 7, 2018, through his present attorney, Maynard filed the instant Petition for Writ of Habeas Corpus, alleging violations of *Brady v. Maryland* and ineffective assistance of counsel. Attached to the Petition was the Affidavit of Nyjah Adams ("Adams Affidavit"), one of the six individuals arrested on January 1, 2000 for possession of the AK-47 discovered at Hospital Ground. The Adams Affidavit provided potentially exculpatory information concerning the circumstances of Hyman, Sr.'s murder, indicating that Adams knew Hyman, Sr., and that on the night of Hyman, Sr.'s murder, Adams witnessed Hyman, Jr. get into an altercation with someone he knew only as "Hamster." Adams Affidavit, ¶¶ 8-9 (Jul. 31, 2018). Adams further stated that "[a]fter the altercation involving Hamster and Mr. Hyman, Jr., Hamster was upset, carrying the AK-47, he left in an angry manner and moments later I heard a discharging of shots. Mr. Maynard was not present when Hamster left with the AK-47." *Id.* at ¶ 11.

¶ 14    On August 30, 2019, the Court entered an Order requiring an informal response from Respondents within 15 days to address Maynard's ineffective assistance of counsel claims, as well as "whether Petitioner may present in this proceeding his allegations of violations of *Brady v. Maryland*, or whether those claims are precluded by having been addressed on direct appeal and his prior Habeas Corpus petition." Order for Informal Response, 2 (Aug. 30, 2019); *see* V.I. H.C.R. 2(c). On March 17, 2020, Maynard filed a Motion to Deem Facts Admitted for purposes of issuing the Writ and further proceedings, based on the Government's failure to respond to the Court's August 30, 2019 Order. On June 17, 2020, the Court entered its Second Order Requiring Informal Response, ordering Respondents to respond to the allegations in the Petition within 15 days.

¶ 15    On July 14, 2020, Respondents submitted their Informal Response, arguing that Petitioner failed to raise a plausible ineffective assistance of counsel claim "given that the totality of the evidence supports his conviction," and that he could not relitigate the *Brady v. Maryland* allegations previously raised on appeal. Informal Response, 9 (Jul. 14, 2020).

¶ 16    This Court found that Maynard had stated a prima facie case for relief, granted his Petition, and issued the Writ of Habeas Corpus on October 29, 2020.[12] On December 11, 2020, Respondents

---

[12] The Court's Order issuing the Writ also deferred ruling on Petitioner's March 17, 2020 Motion to Deem Facts Admitted. As that Motion sought "to have the factual basis deemed admitted for purposes of issuing

filed their Return pursuant to V.I. H.C.R. 2(e). Despite the Court's Order entered January 29, 2021 extending the time within which Maynard might file a Traverse, he did not do so.

¶ 17    On June 2, 2021, the Court scheduled an Evidentiary Hearing to be held July 22, 2021 to address the factual issues in dispute, pursuant to V.I. H.C.R. 2(g). On July 9, 2021, Respondents filed their Motion to Strike and Objection to the Affidavit of Nyjah Adams ("Motion to Strike"). Respondents argued that the Adams Affidavit constituted inadmissible hearsay, obtained nearly eighteen years after Maynard's conviction without the benefit of cross-examination. Motion to Strike, ¶¶ 2, 4, 8 (Jul. 9, 2021). Maynard did not file a substantive response; instead, his counsel moved on July 14, 2021 for a continuance of the evidentiary hearing, which was granted by Order entered July 16, 2021. The hearing was rescheduled for December 8, 2021, but on the day before, Petitioner's counsel filed an "Emergency Motion to Continue," opposed by Respondents. The Court again granted the continuance, but imposed monetary sanctions on Petitioner's counsel for failure to comply with procedural rules.

¶ 18    On January 28, 2022, without response from Maynard, the Court denied Respondents' Motion to Strike, given the stage of the proceeding and the judicial principle that motions to strike are strongly disfavored. The Court held that Respondents' concerns with the Adams Affidavit would be more appropriately addressed at the evidentiary hearing.

¶ 19    The evidentiary hearing was held August 9, 2022. Petitioner called Nyjah Adams, who appeared remotely from St. Kitts. The Government objected on the record to the Court allowing Adams to testify, arguing that "[a]uthenticating this witness and finding him competent...requires more than simply him coming on a screen and saying his name is Nyjah Adams and showing [his passport] from a distance of hundreds of miles to represent that fact." Transcript of August 9, 2022 Hearing, 11. After engaging in additional questioning and noting the Government's objection, the Court permitted Adams to testify. When Petitioner's counsel moved to have the Adams Affidavit offered into evidence the Government again objected, stating that the authenticating attorney

---

the writ of habeas corpus and for further proceedings," and as proceedings have concluded, the Writ has been issued, and relief will be granted herein, that Motion is denied as moot.

"provided an affidavit to the Respondent stating that she has no independent recollection or records of [the Adams] Affidavit."[13] *Id.* at 36.

¶ 20   The Court accepted the Adams Affidavit as Exhibit 1 over Respondents' objection,[14] and Adams proceeded to testify to the substance. *Id.* at 37. He described the individual known as Hamster as someone who was often seen with an AK-47, which was "his signature item that people was [sic] fear him for." *Id.* at 44-45. Adams went on to describe his recollection of July 28, 1999, the night that Hyman, Sr. was killed, stating:

> Hamster showed up again, yeah. I don't know that was like the second time I saw him on that night. And he showed up, and this time he was actually like kind of ramping like he upset about this person. That same name you call, I think, this Adolph person. That is where I vaguely recall that name from, yes. And then he was like, yeah, this person owe him money or some shit. And then he was about to like, yeah, go off. And then he scale off and went. And then a little few minutes later, I don't know about four or five minutes to ten minutes, yeah, we end up heard some gun shots. And then, yeah, that was real loud. I say to myself, that can't be no pistol.

*Id.* at 46-47.

¶ 21   Although he couldn't say for certain whether the AK-47 he saw Hamster possess on that night was the same weapon which led to his January 1, 2000 arrest, Adams noted regarding the AK-47 that "ain't much people had stuff like that…I doubt it had two of those on the streets at those time." *Id.* at 51. He further stated that "if it was a pistol, yeah, I think everyone would have know [sic]. The kind of loudness of the gunshots I know it wasn't a pistol." *Id.* at 59. In response to Respondents' cross-examination as to whether he "ha[s] any expertise in firearms," Adams responded that "I am an expert in hearing the sound that they sound different. The sound wake you up every night and every morning the area where we live." *Id.* at 108-09.

¶ 22   Following the testimony of Adams, Petitioner's counsel called Maynard to the stand. Maynard testified that prior to trial, he did not know the identity of the six individuals arrested for

---

[13] On cross-examination, Respondents introduced the Affidavit of Angelina Gracy Sookoo-Bobb, an attorney licensed in St. Kitts, indicating that she was working at the law office where Adams executed his Affidavit, which bears her signature and notary seal. The Affidavit stated that she did not recall ever meeting Adams or notarizing his Affidavit, and thus at the hearing could not authenticate it.

[14] Despite the Court's admission of the Adams Affidavit and Adams' testimony, the Court herein rules against Petitioner on his prayer for relief purportedly supported by the Adams Affidavit, and grants relief on alternate grounds. As such, Respondents are not prejudiced by the admission of the Adams Affidavit.

possession of the AK-47, and that he did not know their names until the middle of trial. *Id.* at 123. He further testified that the first time he saw trial counsel was the day he hired him about six months prior to trial, and that the second time was the day before trial, when "maybe were [sic] half an hour we spend together." *Id.* at 125, 128, 131. Maynard also stated that he asked trial counsel to locate witnesses for the trial, but that to his knowledge counsel had not done so. *Id.* at 127. Maynard testified that he was not with Hamster on the night of Hyman, Sr.'s murder, and that he did not know him personally but that "St. Thomas is very small…we does [sic] frequent around the same areas." *Id.* at 130.

¶ 23    After the hearing, the Court took the matter under advisement, permitting the parties the opportunity to file briefs following receipt of the hearing transcript. Both post-hearing briefs were filed June 21, 2023. Petitioner's Supplemental Brief reiterated his arguments regarding both the alleged violations of *Brady v. Maryland* and ineffective assistance of counsel, noting his prayer for relief seeking a discharge from his sentence or a new trial. Respondents' Brief reiterated the arguments made in the Informal Response and Respondents' Return, arguing that Maynard failed to carry his burden of proof regarding both his *Brady* and ineffective assistance of counsel claims.

## LEGAL STANDARD

### I.    *Brady Violation*

¶ 24    The Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, applicable to the Virgin Islands through Section 3 of the Revised Organic Act of 1954,[15] require the prosecution to disclose certain evidence to the accused. In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, regardless of the good faith or bad faith of the prosecution." *Ponce v. People*, 72 V.I. 828, 919 (V.I. 2020) (Swan, J., dissenting in part) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). To prevail on a *Brady* claim, a defendant must show that the evidence was "(1)

---

[15] Revised Organic Act of 1954, § 3; 48 U.S.C. § 1561; *see also Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048, 1056 (V.I. 2019) ("Although section 3 incorporates the federal equal protection and due process clauses by reference in addition to its own free-standing equal protection and due process clauses that are unique to the Virgin Islands Bill of Rights, courts have indicated that these provisions serve as separate limitations on the power of the Virgin Islands Government.").

suppressed, (2) favorable, and (3) material to the defense." *People v. Ward*, 55 V.I. 829, 842 (V.I. 2011) (quoting *Bowry v. People*, 52 V.I. 264, 274 (V.I. 2009)).

¶ 25    Both willful and inadvertent suppression of evidence by the prosecution may qualify as suppression under the first *Brady* prong. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). "The government's *Brady* obligations attach to all exculpatory evidence in the government's actual or constructive possession." *Maynard*, 392 Fed. Appx. at 113. Further, "the government must disclose *Brady* material sufficiently in advance of trial to enable the defendant to use the evidence in a meaningful fashion." *Id.* at 114. However, "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *Ward*, 55 V.I. at 845 (quoting *United States v. Starusko*, 729 F.3d 256, 262 (3d Cir. 1984)).

¶ 26    Regarding the second prong, "[e]vidence that is favorable to the accused includes exculpatory evidence and evidence that impeaches a prosecution witness, regardless of whether the evidence has been requested." *People v. Corraspe*, 2018 V.I. LEXIS 10, *3 (V.I. Super. Jan. 31, 2018) (citing *United States v. Bagley*, 473 U.S. 667, 675 (1985)). "The prosecution must also disclose evidence that could be used to impeach a government witness, especially when the witness' testimony is an important part of the prosecution's case." *Id.* (citing *Giglio v. United States*, 405 U.S. 150 (1972)).

¶ 27    Lastly, a piece of evidence is material to the defense when "there is a reasonable probability that the outcome would have been different had the evidence been disclosed to the defense." *George v. People*, 59 V.I. 368, 378 (V.I. 2013) (internal citations and quotation marks omitted). "The purpose of *Brady* is not to require the prosecution to disclose all possibly favorable evidence to the defense but to make certain that the defendant will not be denied access to evidence which would insure him a fair trial." *Id.* (citing *Stevens v. People*, 55 V.I. 550, 556 (V.I. 2011)). Thus, "the ultimate inquiry 'is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Stevens*, 55 V.I. at 556 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

## II.    *Ineffective Assistance of Counsel*

¶28    The right to the effective assistance of competent counsel is guaranteed by the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). The Sixth Amendment applies to the Virgin Islands through Section 3 of the Revised Organic Act of 1954.[16] To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that (1) trial counsel's "performance fell below an objective standard of reasonableness," and (2) that counsel's "deficient performance prejudiced [the defendant], resulting in an unreliable or fundamentally unfair outcome to the proceeding." *Burke v. Prosper*, 70 V.I. 866, 874 (V.I. 2019) (internal citations omitted).

¶29    To satisfy the first prong, a petitioner must overcome the presumption that trial counsel's performance was part of sound trial strategy. *Francis v. People*, 57 V.I. 201, 239 (V.I. 2012) ("Courts generally afford much deference to the tactical decisions of trial counsel even when such decisions prove unsuccessful."). Further, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Ibrahim v. Gov't of the V.I.*, 2008 V.I. Supreme LEXIS 20, *5 (V.I. Jan. 18, 2008) (quoting *Strickland*, 466 U.S. at 690).

¶30    The second prong requires a petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Corraspe v. People*, 53 V.I. 470, 479-80 (V.I. 2010) (internal citation omitted). A reasonable probability of such prejudice is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The question, then, is whether "absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. In answering this question, the court must "consider the totality of evidence." *Id.*

## DISCUSSION

### I.    *Facts Giving Rise to Claims*

¶31    Maynard claims violations of *Brady v. Maryland* and ineffective assistance of counsel. Both require review of facts from his trial regarding the identity of the six January 1, 2000 arrestees

---

[16] Revised Organic Act of 1954, § 3; 48 U.S.C. § 1561.

and prosecution witness Weeks' history of drug use. Those facts are reviewed here, followed by legal analysis.

### a. *Identity of the Six Arrestees*

¶ 32    On January 1, 2000, six individuals were arrested and charged with possession of the same AK-47 that Maynard was purported to have used to kill Adolph Hyman, Sr. five months earlier. The case against the six arrestees was eventually dropped for lack of evidence. Forensic testing by the FBI after the January 1, 2000 arrests determined that at least ten of the sixteen shell casings collected at the Hyman, Sr. murder scene were fired from the same AK-47. During pretrial discovery, the prosecution handed over several documents that identified those arrestees using arrest numbers rather than their names.

¶ 33    At the final pretrial conference on September 10, 2001, two weeks prior to the September 24, 2001 jury selection and trial, Maynard's attorney requested the names of the January 1 arrestees. In response, the prosecutor "represented that the arrestees' names were in a document listing property seized during the arrest... [that] had already been provided to the defense. He said that the government 'ha[d] no further information' and that defense counsel was 'asking for blood out of a rock.'" *Maynard*, 392 Fed. Appx. at 109. On appeal, the Government conceded that the identities of the arrestees did not, in fact, appear in the document that had been provided to the defense.

¶ 34    At the start of trial defense counsel renewed this disclosure request. The prosecutor responded that he had provided counsel with all of the documents he had concerning the weapon, but that none of those documents contained the identity of the arrestees. That statement was "manifestly inconsistent with the prosecutor's statement before trial that the names had already been provided to the defense in an inventory document." *Id.* at 109 n.6.

¶ 35    During the Government's case in chief at trial, the prosecutor called to the stand Officer Miguel Perez, who had investigated the January 1, 2000 shooting incident. During his testimony, the government sought to admit a document that was part of the chain of custody for the AK-47 that did contain the names of the six January 1 arrestees. When Maynard's counsel objected to admission of the report due to the Government's lack of disclosure despite multiple pretrial requests, the prosecutor responded that the chain of custody records in Maynard's file did not

contain the names, and that the document which did contain the names came from a separate case file.[17] The prosecutor indicated that he had first learned of the existence of that document from an unidentified individual in the prosecutor's office during the lunch recess.

¶ 36    Maynard's counsel moved to dismiss on the basis that the Government's late production of this information violated his rights under *Brady*. The prosecution opposed, arguing that the names were not relevant and that even if the arrestees possessed exculpatory information, Maynard had suffered no prejudice because defense counsel still had time to investigate, as the prosecution's case was still ongoing. Despite chastising the prosecution, the trial court denied the motion to dismiss, indicating that it would reconsider the issue at the close of the Government's case. The trial judge urged Maynard to investigate any information that the document might furnish before the close of trial. However, the renewal of Maynard's motion at the close of the Government's case was again denied because the trial court found that defense counsel "could have investigated the individuals after the first day of trial and that he was able to encourage jurors to infer that one of the arrestees was linked to the firearm." *Maynard*, 392 Fed. Appx. at 109. During closing argument, Maynard's counsel urged the jury to make just such an inference, reciting to the jury the names of the six persons arrested for possessing the AK-47, the same weapon used to kill Hyman, Sr.[18]

### b. *Weeks' History of Drug Use*

¶ 37    At the final pretrial conference, Maynard's counsel also requested any records in the Government's possession regarding Weeks' drug use or treatment, information of which the prosecutor responded that he had no knowledge. Defense counsel requested that the Government seek such records from the Virgin Islands Department of Health and, two days later, the prosecutor responded that he had made contact but that without a court order, clinic personnel would not discuss whether records existed for Weeks. Neither party requested any such court order, and the prosecutor did not take any other steps to obtain the records.

---

[17] "The record does not identify whether the document appeared in a file associated with the January 1 arrests, or with another unidentified case. For our purposes, we note only that, whatever the purpose of the file, it was clearly related to the seizure of the AK-47 and contained documents associated with the arrestees being taken into custody." *Maynard*, 392 Fed. Appx. at 109 n.7.

[18] *See infra* note 22.

¶ 38    At trial, prior to opening statements, defense counsel renewed his disclosure request for Department of Health records regarding Weeks' drug treatment, and the prosecutor reiterated that a court order was needed. Defense counsel then served a subpoena on the Department of Health demanding production of those records. After Maynard testified in his own defense, his counsel requested and was granted a continuance to call the Department of Health official who had been subpoenaed but failed to appear. The trial judge asked if counsel needed the court's assistance in procuring the witness's attendance, but defense counsel declined the offer and later rested the defense case without having called the Department of Health witness.

¶ 39    The Department complied with the subpoena the next day, but the records did not arrive at the courthouse until the trial had concluded and the court had closed the evidentiary record and submitted the case to the jury. Maynard requested that the court reopen the evidence to allow him to submit the records to the jury, but the court refused. Following the conclusion of the trial but prior to the hearing on Maynard's motion for new trial, defense counsel was able to obtain the information he had repeatedly requested yet did not receive prior to resting his case during trial.

¶ 40    The Department of Health records received post-trial included a discharge summary noting that Weeks reported an eleven-year history of crack cocaine use and was characterized by therapists as "a pathological liar who alters the truth to fit her needs and fantasies." *Maynard*, 51 V.I. at 763.   However, the only evidence the jury heard regarding Weeks' drug use came from Maynard's testimony and from defense counsel asking Weeks about her drug use on cross-examination.[19]

---

[19] Weeks' drug use was featured in the closing arguments of both defense counsel and the prosecutor. Maynard's counsel argued: "What else do we know about Maria Weeks? She, we submit the evidence is that she's a crack addict. She bought crack. Mr. Maynard said he saw her."

In its initial closing argument, the prosecutor argued: "How does [Maynard] get the nerve to call that woman a crackhead? He has the nerve to call that woman, who he had just killed her husband, he is going to now call her a crackhead. I spit at the idea of him taking that type of revenge out on this family even further."

In its rebuttal argument, the prosecution doubled down: "And that's the person that we're referring to as a crackhead. Crackhead. The only person that said Maria Weeks is a crackhead is Kenrick Maynard. That's a heck of a thing to say about somebody. That's a heck of a thing to call a woman like that. Okay?" *Maynard*, 51 V.I. at 762-63, n.13, 14.

## II. Analysis - Brady Violations

¶ 41 To prevail on a *Brady* claim, a petitioner must show that evidence was "(1) suppressed, (2) favorable, and (3) material to the defense." *Bowry*, 52 V.I. at 274. Maynard raises two *Brady* claims: (a) the prosecution's failure to turn over the identities of the six individuals arrested January 1, 2000; and (b) the prosecution's failure to turn over evidence related to Maria Weeks' drug use. Petition at ¶¶ 26-34, 44-48. Respondents contend that Maynard "was not prejudiced by a purported *Brady* violation because the Government did not suppress evidence" or, in the alternative, "even if the Court were to determine that the Government suppressed evidence, Petitioner has failed to demonstrate that such evidence is favorable and material." Respondents' Return, 11 (Dec. 11, 2020).

### a. *Identity of the Six Arrestees*

¶ 42 The record clearly supports the finding that the prosecution suppressed the identities of the six persons arrested on January 1, 2000, charged with possession of the same weapon that had been used in the July 28, 1999 murder for which Maynard was convicted, satisfying the first prong of *Brady*. *Brady* requires the prosecution to provide to the defendant "all exculpatory evidence in the government's actual or constructive possession," and a prosecutor must "'take the minimal steps necessary to acquire...information' of which the prosecution should be aware, even if it lacks knowledge of the material at the time the defendant requests disclosure." *Maynard*, 392 Fed. Appx. at 113 (internal citation omitted).

¶ 43 Here, the six arrestees were handled by the same police department that investigated the murder of Hyman Sr., and both matters were referred for prosecution to the Office of the Attorney General of the Virgin Islands. The Court concurs with the reasoning of the Appellate Division of the District Court:

> The purpose of *Brady* and its progeny would be seriously undermined if knowledge of material, exculpatory evidence could not be imputed between two attorneys working for the same sovereign in the very same office with a relatively small number of attorneys, simply because one attorney works on criminal matters while the other works on domestic relations matters.

*Maynard*, 51 V.I. at 765-66 (internal citations omitted).[20]

¶ 44    The trial judge, the Appellate Division, and the Third Circuit all admonished the Government's attorney for his conduct and callous disregard of the repeated requests of defense counsel for the names of the January 1 arrestees, to which Maynard was clearly entitled. Indeed, "the prosecutor failed to perform even the most rudimentary search for their names." *Maynard*, 392 Fed. Appx. at 113. In this setting where a criminal defendant's liberty is at stake the constitutional obligations of the prosecutor require "disclosure of exculpatory 'information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution.'" *Id.* (quoting *Wilson v. Beard*, 589 F.3d 651,659 (3d Cir. 2009)).

¶ 45    Nevertheless, the record establishes that Maynard's counsel could have obtained this information through the exercise of reasonable diligence, both prior to and during trial. Defense counsel received the arrestees' names during trial, entered them into evidence, and urged the jury to draw an inference that one of them was connected to the murder weapon.

¶ 46    The Third Circuit found that the prosecution had suppressed the arrestees' identities but determined that Maynard had "not moved his *Brady* challenge beyond the realm of conjecture" regarding the second and third prongs, favorability and materiality, because "insofar as the names of the January 1 arrestees were themselves exculpatory, Maynard presented them to the jury and urged jurors to conclude that one of the arrestees was linked to the weapon or to the murder." *Id.* at 117-18. The Court concurs and finds no basis for relief under *Brady* regarding the identity of the January 1 arrestees.

---

[20] The quoted language of the Appellate Division relates to the Government's failure to turn over evidence relating to Maria Weeks' drug use but applies equally here. In that case before the Family Division of the Territorial Court, the Government sought to remove Weeks' children from her custody due to her drug use. The Appellate Division found "little doubt that the Government prosecutor in this matter [was] charged with knowledge of the custody proceedings involving Weeks." *Maynard*, 51 V.I. at 765. That rationale is even more compelling regarding the names of the January 1 arrestees, against whom criminal charges were brought by the same division of the Office of the Attorney General that later brought the case against Maynard. *See also United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991) (holding that a prosecutor had constructive knowledge of information held by another arm of the government accessible to the prosecutor).

### b. *Weeks' History of Drug Use*

¶ 47    The Appellate Division and the Third Circuit also found no *Brady* violation concerning the Government's failure to provide Department of Health records relating to Maria Weeks' drug use because the information could have been discovered through the defense's exercise of reasonable diligence. *Maynard*, 51 V.I. at 766 ("There are strong indications in the record that the Government misled – whether intentionally or unintentionally – the defense by repeatedly insisting that it had...[no] knowledge of Weeks' drug use...Balanced against the Government's knowledge of Weeks' drug use...however, is Maynard's apparent knowledge of, and total lack of diligence in obtaining information about, that drug use."); *Maynard*, 392 Fed. Appx. at 120 ("Because Maynard's counsel could have obtained the records prior to trial through the exercise of reasonable diligence, those records cannot serve as the basis for relief under *Brady*."). The Court concurs and finds no basis for relief under *Brady* arising from the Government's failure to provide Department of Health records relating to Weeks' drug use, as those records were reasonably available to Maynard.

### III.    *Analysis - Ineffective Assistance of Counsel*

¶ 48    To prevail on an ineffective assistance of counsel claim, a petitioner must (1) overcome the presumption that trial counsel's performance was part of sound trial strategy by identifying specific "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and that (2) raise a reasonable probability of prejudice such that confidence in the outcome of the trial is undermined. *Ibrahim*, 2008 V.I. Supreme LEXIS 20 at *5; *Strickland*, 466 U.S. at 694. Maynard raises two ineffective assistance of counsel claims: (a) trial counsel's failure to request a continuance at the final pretrial hearing; and (b) trial counsel's failure to investigate (i) the six arrestees and (ii) key prosecution witness Maria Weeks' history of drug use. The Court finds that Maynard has not established that acts or omissions of counsel entitle him to relief for failing to request a trial continuance at the pretrial conference or for failing to investigate the identities of the six January 1, 2000 arrestees. Nonetheless, the Court does find that Maynard is entitled to relief as a result of trial counsel's failure to investigate Maria Weeks' history of drug use.

### a. *Counsel's Decision Not to Request a Continuance*

¶ 49    Maynard argues that he was denied a fair trial because defense counsel failed to request a continuance of the trial at the final pretrial hearing two weeks prior. He posits that such a continuance would have permitted further investigation into the individuals arrested for possessing the alleged murder weapon and, regarding Weeks, to "procure evidence of the eyewitness's prior crack use and diagnosis of being a pathological liar." Petition at ¶¶ 35-39. Instead of seeking to continue the trial to permit further investigation, defense counsel renewed his document disclosure requests at the final pretrial conference and again at the commencement of trial, to no avail.

¶ 50    The Court finds that counsel's failure to request a continuance of trial does not, standing alone, overcome the presumption afforded to counsel that such action was part of sound trial strategy. *See Simon v. Gov't of the Virgin Islands,* 71 V.I. 1227, 1242 (3d Cir. 2019) ("It is a high bar to claim ineffectiveness from failing to seek a continuance or lack of time to prepare."). The time required to investigate these matters may not have necessitated a continuance of the trial, if counsel had successfully obtained the documentation sought. As such, defense counsel's failure to request a continuance, in itself, does not amount to ineffective assistance of counsel.

### b. *Counsel's Failure to Investigate*

#### i. *Identity of the Six Arrestees*

¶ 51    The Court finds that Maynard has satisfied the first prong of the ineffective assistance of counsel analysis, overcoming the presumption that counsel's failure to make attempts to identify and investigate the arrestees before or during trial was part of sound trial strategy and that such omissions were not the result of reasonable professional judgment. Counsel could have made attempts to learn the identities of the arrestees prior to trial by contacting the law enforcement personnel who handled the arrests. Further, counsel never spoke with any of the arrestees after learning their names, even though the court did not rule on Maynard's *Brady* challenge until a month after trial. These omissions cannot in good faith be deemed to have been part of a sound trial strategy.

¶ 52    Yet, as the trial judge noted, counsel had all the information necessary to argue to the jury that someone else possessed the AK-47.[21] Indeed, counsel made that argument to the jury.[22] Further, there is no showing that any of the six arrestees could have provided exculpatory evidence. As such, Maynard has not raised a reasonable probability of prejudice such that confidence in the outcome of the trial is undermined to the extent necessary to satisfy the second prong of his ineffective assistance of counsel claim. *See Maynard*, 51 V.I. at 760; *Ibrahim*, 2008 V.I. Supreme LEXIS 20 at *5. Accordingly, the Court finds that Maynard has not established his ineffective assistance of counsel claim regarding counsel's failure to investigate the identities of the six arrestees.

### ii.    Weeks' History of Drug Use

¶ 53    It is undisputed that the defense knew about Weeks' drug use, knew how to obtain information about that drug use, and was offered assistance of the court to do so. Defense counsel's failure to take steps, with or without the trial court's offered assistance, to obtain this significant information concerning Weeks easily overcomes the presumption of sound trial strategy. It is clear that, with due diligence of counsel in advance of or during trial, the evidentiary landscape before the jury would have been vastly different from that upon which Maynard was convicted.

¶ 54    Counsel repeatedly declined assistance of the trial court to procure this crucial information concerning the prosecution's key eyewitness before and during trial. The relative ease with which counsel obtained the information after trial, as he could have done before trial, leads to the inescapable conclusion that Maynard's counsel's representation was objectively unreasonable, indicative of a lack of zealousness in preparation and advocacy at trial. As such, regarding Weeks' records, Maynard has satisfied the first prong of his claim for ineffective assistance of counsel, as

---

[21] The trial judge further stated: "The Court finds that the defendant had all the information to discover those names, and based on cross-examination probably knew of those named..." *Maynard*, 51 V.I. at 760.

[22] During closing argument, Maynard's counsel urged the jury to infer that one of the arrestees was linked to the firearm in an attempt to discredit the government's theory that Maynard was responsible for the murder of Hyman, Sr.:

"But we know, do we not, that somebody else other than Kenrick Maynard possessed that gun, because on January 1, 2000, there was a shooting...

"... [The police] arrested Jose Hodge, Antonio Benjamin, Sherman Louis, Kareem George, Naja Adams, and Kwasi Adams [] for possession of that same firearm, the gun that was used to kill Adolph Hyman [Sr.] ..."

*Maynard*, 392 Fed. Appx. at 110.

the Court finds that the representation included acts and omissions that were not consistent with any sound trial strategy or the exercise of reasonable professional judgment. *See Ibrahim*, 2008 V.I. Supreme LEXIS 20 at *5.

¶ 55    As to the second prong, the Court finds that defense counsel's failure to investigate Weeks' history of drug use and propensity for prevarication raises a reasonable probability of prejudice to Maynard, undermining confidence in the outcome of the trial. The question here is whether, absent the errors of counsel, "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. Weeks was the Government's key eyewitness. Maynard had personal knowledge of her drug use and, because of counsel's "deficient performance," Maynard's defense was prejudiced by the fact that his testimony as the accused was the only evidence the jury heard to impeach Weeks' credibility. *See Burke v. Prosper*, 70 V.I. at 874. Had Maynard been able to present concrete impeachment evidence about Weeks' eleven-year history of crack cocaine addiction, as well as her therapists' characterization that she was "a pathological liar who alters the truth to fit her needs and fantasies," Weeks' credibility as a witness would have undoubtedly been seriously affected. On these facts, by the acts and omissions of his counsel, Maynard was substantially prejudiced at trial to the extent that confidence in the outcome of the trial has been undermined.

¶ 56    Considering the "totality of the evidence," the Court finds that Maynard's inability to present at trial concrete evidence to support his own testimony of Weeks' drug use, evidence that with diligence was available to his counsel, likely "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Strickland*, 466 U.S. at 695-96. On these facts, the Court finds that "there is a reasonable probability that, absent the errors [of counsel], the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. As such, Maynard has satisfied the second prong of his claim for ineffective assistance of counsel and is entitled to relief.

## CONCLUSION

¶ 57    In sum, the Court finds that Petitioner Maynard was deprived of constitutionally mandated effective assistance of counsel at trial. Defense counsel's failure to investigate Government witness Maria Weeks' history of drug use fell below an objective standard of reasonableness. Counsel's

deficient performance prejudiced Maynard "resulting in an unreliable or fundamentally unfair outcome in the proceeding." *Burke*, 70 V.I. at 874. Maynard prays for an order discharging him from his sentence or, in the alternative, a new trial. Chapter 91 of Title 5 of the Virgin Islands Code governing habeas proceedings "contemplates remedies other than discharge...[and] recognizes that an incarcerated individual may not be entitled to immediate discharge from custody, yet may still be unlawfully imprisoned and entitled to relief." *Rivera-Moreno*, 61 V.I. at 295.

¶ 58   In light of the foregoing, Petitioner is granted relief by separate Order entered herewith, vacating that portion of the November 21, 2001 Judgment and Commitment entered in Criminal No. ST-F400/2000 adjudicating Maynard guilty of the Virgin Islands crimes of first-degree murder (14 V.I.C. § 922(a)(1)) and unauthorized possession of a firearm (14 V.I.C. § 2253(a)), and granting a new trial on those charges.

DATED: July 7, 2023

DOUGLAS A. BRADY, JUDGE

**ATTEST:**

TAMARA CHARLES
Clerk of the Court

By: Sharisse A. Bascombe
Court Clerk Supervisor



IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

**FILED**

July 07, 2023 08:26 AM
SX-2018-MC-00066
**TAMARA CHARLES**
**CLERK OF THE COURT**

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

KENRICK MAYNARD,

                      Petitioner,

    v.

GOVERNMENT OF THE VIRGIN
ISLANDS, GOVERNOR ALBERT BRYAN
in his official capacity, ARIEL M. SMITH,
ATTORNEY GENERAL in her official
capacity, BUREAU OF CORRECTIONS
DIRECTOR WYNNIE TESTAMARK in her
official capacity, CITRUS COUNTY
DETENTION CENTER WARDEN MIKE
QUINN in his official capacity,

                      Respondents.

SX-2018-MC-00066

PETITION FOR WRIT OF
HABEAS CORPUS

## ORDER

By Memorandum Opinion entered in this matter herewith, Petitioner is entitled to relief on his Petition for Writ of Habeas Corpus. Accordingly, it is hereby

ORDERED that Petitioner's prayer for relief pursuant to Writ of Habeas Corpus is GRANTED. It is further

ORDERED that the portion of the November 21, 2001 Judgment and Commitment in Criminal No. ST-F400/2000 adjudicating Petitioner GUILTY of Count IV (First-Degree Murder: 14 V.I.C. § 922(a)(1)) and Count V (Unauthorized Possession and Carrying of a Firearm: 14 V.I.C. §§ 2253(d) and 2253(a)) is VACATED and set aside. It is further

ORDERED that Respondent, through the Office of the Attorney General, shall notify the Court, **in writing, within thirty (30) days** of the date of entry of this Order whether the People of the Virgin Islands intend to retry the referenced criminal charges against Petitioner. It is further

ORDERED that Petitioner shall remain in the custody of the Bureau of Corrections pending further Order of the Court. It is further

ORDERED that a copy of this Order and the accompanying Memorandum Opinion shall be served FORTHWITH on all parties and appearing counsel.

DATED: July 7, 2023

                      DOUGLAS A. BRADY, JUDGE

**ATTEST:** TAMARA CHARLES
Clerk of the Court

By: _Sharisse A. Bascombe_
        Court Clerk Supervisor

IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

**FILED**

July 10, 2023 08:36 AM
SX-2018-MC-00066
TAMARA CHARLES
CLERK OF THE COURT

# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## District of St. Croix

| | |
|---|---|
| **Kenrick Maynard,** | Case Number: **SX-2018-MC-00066** |
| **Plaintiff** | Action: **Writ of Habeas Corpus** |
| **v.** | |
| **Kenneth Mapp, et al,** | |
| **Defendant.** | |

## NOTICE of ENTRY
## of
## <u>Order</u>

**To:** Yohana M. Manning, Esq.             Michael Robert Francisco, Esq.

**Please take notice that on July 10, 2023 a(n) Memorandum Opinion and Order dated July 7, 2023 was/were entered by the Clerk in the above-titled matter.**

**Dated:** July 10, 2023

**Tamara Charles**
_____
**Clerk of the Court**

By: _____

**Sharisse Bascombe**
**Court Clerk Supervisor**